Carter's Case.

In the matter of the probate of paper purporting to be the last will and testament of MARY A. CARTER, deceased.

[Filed June 26th, 1900.]

The facts do not prove that the testatrix was unduly influenced in making her will.

*Mr. Woodbridge Strong,* proctor for the petitioner.

*Mr. Henry B. Cook,* proctor for the respondents.

*Mr. William D. Daly,* of counsel for the respondents.

THE VICE-ORDINARY.

This is an application to have admitted to probate a paper dated December 14th, 1899, executed by Mary A. Carter, then and at her death domiciled in the city of New Brunswick, Middlesex county.

A *caveat* was filed in the surrogate's office of that county, and the will is now produced in this court for probate.

The paper was executed in conformity with the statutory requirements. The grounds urged against the validity of the instrument are—*first,* want of testamentary capacity in the testatrix, and *second,* that its execution was unduly influenced by two of the beneficiaries, in conjunction with the attorney who drew the will.

The objection to the validity of the will, upon the ground of want of testamentary capacity, has no substance. Although the testatrix was about eighty-one years of age, and from an injury to her hip, was somewhat of an invalid, and although she was unable to read and write, she yet had strength of mind and a natural sagacity which was rather remarkable in a woman of her age and education. All the testimony exhibits her as one thoroughly conversant with her own affairs, and with the kind and value of her property, and with a full knowledge of the

number and degree of kinship of her relations. Further consideration of this phase of the case may be dismissed.

In the second place it is charged that the provisions of the will were the offspring of the influence of Michael Hearn and John Fitzgerald, two of the principal beneficiaries, in the interest of whom was the attorney who drafted the instrument. It is also charged that this influence was unduly exerted upon the mind of the testatrix.

The charge that the draftsman of the will was operating in the interest of Hearn and Fitzgerald to secure a testamentary disposition in their favor by any influence, undue or otherwise, is unsupported by any testimony whatever. The gentleman thus charged is a practitioner of this court, of unblemished reputation and acknowledged learning, who has twice held important judicial positions by appointment, and whose character alone would refute a charge of the exertion of undue influence upon the mind of any person, by whom he was called in to advise.

But apart from the character of the draftsman, there is no evidence that would impute to any person, standing in his stead, and acting as he did, such a course of conduct. For a considerable period this old lady had had in mind the settlement of her affairs, in view of her death. She had spoken of it to her attorney, who afterwards drew the will. She was waiting for the final settlement of a litigation and negotiations in which she, as an executrix of her husband's estate, was concerned. The attorney who had been the adviser of herself and Fitzgerald, the other executor of her husband, had stated to her that in view of the amount of business that he had already done, he would, whenever she concluded to execute her will, draw it without charge. She told him, in an interview upon another matter, a short time before the will was executed, that she would send him a memorandum of instructions. This memorandum was afterwards prepared in the handwriting of Michael Hearn, and by Hearn taken to the office of the draftsman. The provisions, so far as they concerned the beneficiaries Michael Hearn and his wife and John Fitzgerald and his son, were the same in the memorandum as afterwards in the will. There is no evidence

that previous to the forwarding of this memorandum to the draftsman there was ever one word between the latter and the testatrix in respect to the manner in which, or the persons to whom she should leave her property. After receiving the memorandum he visited the testatrix, read it over to her, and asked her if it was all right, and she said it was. At that time she made some additions to the memorandum, which additions are in the handwriting of the attorney.

Again, on the 13th of December he went to the house of testatrix to get her acknowledgment to a deed. He had written the will, had it with him, and he then read it over to her, and she said it was what she wanted.

On the next day the will was executed, when it was again read over to her in the presence of the other witness to it. The only suggestion made by the scrivener was in calling testatrix's attention to William J. Fitzgerald, a grand-nephew, whose name was not upon the memorandum. At the close of the interview she concluded to insert his name for a legacy of $500. The suggestion was entirely proper and creditable. Previous to the execution of the will, the testatrix had made, as a part of her scheme for the final distribution of her property, three deeds, one to John Fitzgerald for a property in George street, another to Michael Hearn of a half interest in the property in which she lived, and a third to William J. Fitzgerald for the property in which he lived, reserving a life interest to herself in each of the properties. These deeds were all drafted by the gentleman who subsequently drew the will.

Voluminous testimony was introduced as to what occurred at the time of the execution of these deeds, with the design of imputing some misstatement then made by the draftsman of the subsequent will. But the order of events in the execution of these various papers, the condition of affairs at the time, the conversations alleged to have occurred, and the explanation of the witnesses for the proponent, relieve the case of the slightest imputation of misstatement or collusive conduct by the attorney who conducted the affair.

The case of the caveators then must rest upon the alleged undue influence exercised by Michael Hearn and John Fitzgerald, or either of them.

Michael Hearn had married, as his first wife, a niece of the testatrix. For a number of years Michael Hearn had occupied apartments in a part of the same building of which the testatrix occupied another part, Hearn conducting a saloon business on the first floor of the said building. The testatrix kept her own house, having a servant of her own. The relations of Michael Hearn towards the old lady was that of a friend, who had been related to her by marriage, and who had looked after such business affairs as needed attention, principally the collection of the rents of the property of the testatrix, and payment of the bills of the old lady. He says the rents he collected were turned over to her in money, and the bills that he paid were paid from moneys which he received from her at the time of payment. He denies having ever introduced the subject of making a will to the testatrix; he says that she spoke of the matter to him, and asked him to take paper and pencil and write down an estimate, made by the old lady and himself, of the value of her property remaining after the execution of the deeds already referred to, to be disposed of by will. He says that they together went over the different items of property and discussed their value; that then she directed him to put down the names of the legatees and the amounts of the several legacies, as they appear upon the memorandum, afterwards taken to the draftsman of the will. He says that he had never asked her to leave him or his family anything, but she had indicated her intention to leave him the one-half interest in the property in which they lived; that the bequests of $1,000 to himself and to his wife were first made known to him at the time she directed him to place them upon the memorandum, and that he then thanked her for her kindness.

The other beneficiary, John Fitzgerald, was the only living nephew of the testatrix. He was, together with the testatrix as executrix, the executor of her husband's estate. He was employed in the city of Trenton, visited New Brunswick once in two or three months, at which times he called upon testatrix. He denies having ever attempted to influence the testatrix in his own favor, but says she had often announced her intention of giving him the George street property, and had said that was all

Carter's Case.

he would get. He admits conversing with her about the legacy left to his son, whose education is provided for under the terms of the will. The provision is that a sufficient sum should be set apart to realize annually $250, which shall be paid for the education of the lad until he attains the age of twenty-one; that he is to receive the sum so set apart. He admits discussing with her the amount which would be sufficient to pay for such education, and also the sum which should be set apart to realize this annual sum.

In addition to this provision for one of John Fitzgerald's sons, there was a legacy of $1,000 left to another son.

Now the relations of both Michael Hearn and John Fitzgerald to the testatrix were such undoubtedly that any unnatural or extravagant bequest to them, to the exclusion of others, who by kinship or otherwise had equal claims upon the testatrix, would be calculated to arouse the suspicion of the exercise of personal influence by the beneficiaries upon the testatrix.

The first inquiry, therefore, in cases of this kind is, was the testamentary disposition unnatural—such as a rational person under the conditions would not have been likely to make?

Now it appears that the estate of this testatrix, previous to the making of her deeds, as a part of her scheme of testamentary disposition, as already mentioned, amounted to about $40,000. She deeded to John Fitzgerald property worth about $10,000; to Michael Hearn a property valued at about $2,000, and to William J. Fitzgerald a house valued at about $1,000.

In addition, Michael Hearn and his wife each got $1,000 under the will. John Fitzgerald himself probably got nothing under the will for, although he is made residuary legatee, it is pretty evident that the residue will not, and was understood at the time of the execution, would not be of much value. One of the sons, however, will get about $5,000 and the other $1,000.

Now, after taking into account the legacies left to the two parishes—the $5,000 and the $2,000—and the legacy to the orphan asylum of $2,000, and the general distribution of the balance of the estate among her collaterals, it cannot be said that the distribution of the property was so irrational as to in itself afford evidence that the will was the product of undue

influence. The closeness of kinship, friendship, religion and kindly services are amply sufficient to account for any seeming diversity in the amounts of the legacies. The case rests wholly on the fact that Michael Hearn lived in the same house as did the testatrix, and that John Fitzgerald was associated with her as the executor of her husband's estate. There is not proved a single attempt on the part of either of these gentlemen to control the testatrix in the disposition of her property. They deny that any such attempt was made. More than this, it is highly probable that the purpose of anyone who so attempted to influence the testatrix would have been foiled, for she seemed to have been possessed of quite a remarkable degree of sagacity and stubbornness.

I will advise a decree admitting the will to probate.